**TENOCO OIL COMPANY, INC., et al.,
Plaintiffs, Appellees,**

v.

**DEPARTMENT OF CONSUMER AFFAIRS and Pedro Ortiz–Alvarez, Secretary of the Department of Consumer Affairs, Defendants, Appellants.**

**No. 86–1590.**

United States Court of Appeals,
First Circuit.

Heard Sept. 7, 1988.

Decided June 2, 1989.

Lynn R. Coleman with whom Douglas G. Robinson, Matthew W.S. Estes, Washington, D.C., William S. Scherman, Henrietta Wright, Washington, D.C., Thomas J. Dougherty, Lori Weiner Lander, Skadden, Arps, Slate, Meagher & Flom, Boston, Mass., Marcos A. Ramirez, Dennis A. Simonpietri and Ramirez & Ramirez, Hato Rey, P.R., were on brief, for defendants, appellants.

Maximiliano Trujillo on brief for Asociacion de Detallistas de Gasolina de Puerto Rico, Inc., amicus curiae.

Rafael Perez–Bachs with whom Nestor M. Mendez–Gomez, Maggie Correa–Aviles, Ana Matilde Nin, Arturo J. Garcia–Sola, McConnell Valdes Kelley Sifre Griggs & Ruiz Suria, Hato Rey, P.R., Igor Dominguez, William Estrella Law Offices, Noel S. Gonzalez–Miranda, Mario L. Paniagua and Sweeting, Gonzalez & Cestero, Hato Rey, P.R., were on brief for plaintiffs, appellees Shell, Mobil, Phillips, Texaco and Careco.

Etienne Totti del Valle, Hato Rey, P.R., Carlos Romero Barcelo and Dominguez & Totti, Hato Rey, P.R., on brief for plaintiff, appellee Tenoco Oil Co., Inc.

Jaime Sifre–Rodriguez, Luis Sanchez–Betances and Sanchez–Betances & Sifre, Hato Rey, P.R., on brief for appellee Esso Standard Oil Co. (P.R.).

Alvaro R. Calderon, Jr., Hato Rey, P.R., on brief for plaintiffs-appellees Isla Petroleum Corp. and Gasolinas de Puerto Rico, Inc.

Before CAMPBELL, Chief Judge, SELYA, Circuit Judge, and TAURO,[*] District Judge.

LEVIN H. CAMPBELL, Chief Judge.

This appeal is from a permanent injunction issued by the United States District Court for the District of Puerto Rico invalidating gasoline price regulations issued by an agency of the Puerto Rico government.[1] The opinion of the district court is published at *Isla Petroleum Corp. v. Department of Consumer Affairs*, 640 F.Supp. 474 (D.P.R.1986). As we believe the enjoined price order was not yet ripe for constitutional review, we vacate the district court's injunction.

## I. BACKGROUND

This dispute arose when the Puerto Rico Department of Consumer Affairs (referred to herein as DACO, the acronym of its Spanish title, *Departamento de Asuntos del Consumidor*) issued in early 1986 consecutive orders regulating the price of gas-

---

[*] Of the District of Massachusetts, sitting by designation.

1. The district court enjoined the agency's regulatory scheme on the ground that it violated the prohibition in the United States Constitution against the deprivation of property without due process of law, and, separately, on the ground that state regulation of gasoline prices was preempted by an alleged federal policy since 1981 mandating deregulation. 640 F.Supp. at 515. DACO appealed from the court's preemption ruling to the Temporary Emergency Court of Appeals ("TECA"), which had jurisdiction over only the preemption issue. TECA affirmed the district court's ruling that DACO's regulation was preempted, but a unanimous Supreme Court thereafter reversed. *Puerto Rico Department of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 108 S.Ct. 1350, 99 L.Ed.2d 582 (1988). The present appeal, challenging the propriety of the injunction on the alternative ground of due process, was stayed until the Supreme Court disposed of the preemption question. The Court's reversal of the preemption ruling left pending before us the question of the scheme's constitutionality under the due process clause.

oline in Puerto Rico. The plaintiffs in this litigation composed of eight separate suits consolidated for trial, comprised most of the gasoline wholesalers and refiners serving the Puerto Rico market.[2]

DACO is empowered by Puerto Rico law to regulate the prices and profit margins of goods and services provided to the Puerto Rico public in order to protect consumers' rights and restrain inflation. P.R.Laws Ann. tit. 3, § 341b (1982). From 1973 until 1981, however, gasoline prices in Puerto Rico, as in the mainland United States, were regulated by the United States government, preempting separate regulation by DACO.[3] Federal price controls took the form of a limitation upon the gross profit margin obtained from gasoline sales. In 1981, the gross profit margin on gasoline was limited by federal law to 8.6¢ per gallon for the wholesale sale of gasoline and 17.7¢ per gallon for the retail sale. The term "gross profit margin" refers to the difference between a seller's sales price and the seller's acquisition cost. "Acquisition cost" includes the price the seller paid for gasoline plus excise taxes, but not the seller's transportation costs and other operating costs. A "gross" margin differs from "net" margin in that the latter excludes operating costs as well as acquisition costs. Thus the 8.6¢ per gallon gross profit margin set by the federal government for wholesalers in 1981 was intended

to encompass the wholesaler's operating costs plus a return on its investment.

In 1975, anticipating the federal government's imminent withdrawal from gasoline price regulation, DACO promulgated Price Regulation 45, which authorized DACO's Secretary to regulate the prices and "maximum margins of benefits" of gasoline, kerosene, and diesel fuel.[4] However, in December 1975, Congress extended the period of federal regulation until 1981. 15 U.S.C. § 760g (1976). DACO accordingly amended Price Regulation 45 to provide that it would not take effect until the federal government ceased its regulation. Price Regulation 45, Amend. 1 (July 23, 1976) (hereinafter "Regulation 45"). The amendment to Regulation 45 provided that once federal price controls over gasoline and other oil products were lifted, and so long as DACO's Secretary had not yet issued a price order, no person could increase the selling price of gasoline without giving 15 days' written notice of the change to the Secretary. Regulation 45, Art. 3. The same regulation authorized the Secretary to issue orders "fixing and revising prices and the maximum margins of benefits on the sale of the regulated product at any distribution level," and established criteria to be used by the Secretary in fixing prices and margins.[5] Regulation 45, Art. 4. The Secretary was empowered to request any data necessary to attain the regulation's purposes. Regulation 45, Art. 8.

2. The Puerto Rico gasoline industry is comprised of refiners, wholesalers and retailers. The major issue in this lawsuit is the constitutionality of the regulatory orders as they affect the wholesalers.

Plaintiffs in the original action included ten gasoline wholesalers and two refiners. The refiners were Phillips Puerto Rico Core, Inc. ("Phillips") and Caribbean Gulf Refining Corporation ("Careco"). Careco is also a gasoline wholesaler. Other wholesaler plaintiffs included Isla Petroleum Corporation ("Isla"), Gasolinas de Puerto Rico Corporation ("Gasolinas"), Texaco Puerto Rico, Inc. ("Texaco"), Cia. Petroleum Caribe, Inc. ("Caribe"), The Shell Company (Puerto Rico) Ltd. ("Shell"), Mobil Oil Caribe, Inc. ("Mobil"), Esso Standard Oil Co. (P.R.) ("Esso"), Tenoco Oil Company, Inc. ("Tenoco"), and Distribudora El Coqui, Inc. ("Coqui"). Coqui sought voluntary dismissal of its complaint. Isla, Gasolinas, and Caribe limited their complaints to the issue of preemption, and are not

parties to this appeal. Appellee-wholesalers before this court, therefore, include Careco, Texaco, Shell, Mobil, Esso, and Tenoco.

3. Appellants contend that prior to 1973 the Commonwealth of Puerto Rico regulated gasoline prices; the district court assumed without discussion that prior to 1973 the gasoline market in Puerto Rico was unregulated. We have not attempted to unravel this controversy.

4. DACO promulgated Regulation 45 pursuant to authority granted DACO's Secretary by DACO's Organic Act, P.R. Laws Ann. tit. 3, §§ 341–341v (1982).

5. The criteria include the costs of refining gasoline, reasonable benefit to refiners, and reasonable benefit to wholesalers and retailers, taking into account a reasonable margin for operational costs, reasonable profits, and volume of sales. Regulation 45, Art. 4.

The federal government lifted its controls over gasoline prices in 1981, but for the next four years DACO's Secretary did not exercise the authority contained in Regulation 45 to issue orders fixing prices and maximum margins. Instead, DACO officials informally indicated to the oil companies during this period their expectation that gross margins should stay within levels formerly prevailing under federal regulation. The district court found "that DACO and the wholesalers/retailers adopted informally as a reference point for future regulation the federal margins as they existed on January 28, 1981." It also found that one wholesaler, Shell, had made refunds in 1982 and 1983 of amounts received in excess of the earlier 8.6¢ per gallon gross profit margin limitation. Nonetheless, DACO promulgated no regulation specifically fixing a maximum margin or otherwise controlling gasoline prices. Although there was some compliance with Article 3's 15-day notice requirement relative to price increases, compliance appears to have been spasmodic, and DACO seems to have made no consistent attempt to enforce it.

In January 1985 a new governor of Puerto Rico took office, and appointed a new Secretary of DACO. In September 1985, without issuing any price orders, the new Secretary issued a memorandum to the industry indicating DACO's intent to "supervise" the gross profit margins of 17.7¢ and 8.6¢ per gallon that (in the words of the memorandum) were "maintained" when federal controls were eliminated. Distributors "at all levels of distribution" were warned to comply with Regulation 45. During the first quarter of the following year, 1986, there were significant reductions in world oil prices. However, the wholesale and retail selling prices of gasoline in Puerto Rico did not go down by a corresponding amount. Evidence presented at trial indicates that at least one, and probably several wholesalers' gross profit margins were at this time in excess of 20¢ per gallon.

There were many complaints about the high gasoline prices on the island, and these caused the Puerto Rico legislature to take action in March of 1986. In order to recoup (for the government) some of the "excessive profits" that the oil companies were believed to be reaping, the legislature imposed an additional excise tax on crude oil and refined petroleum products.[6] To make sure that the oil companies paid the new tax out of excess profits, without passing the tax through to the consumer in the form of even higher prices, DACO for the first time issued orders controlling prices pursuant to its authority under Regulation 45. But first, immediately after the new excise tax took effect, the Secretary issued, on March 26, 1986, an "interpretation" of Regulation 45, reminding the industry that Regulation 45 forbade oil companies to raise prices without first notifying the Secretary. This was followed, on April 23, 1986, by orders allowing refiners to pass the excise tax through to wholesalers; forbidding wholesalers from passing the tax through to retailers; and freezing wholesale and retail prices at their March 31, 1986 levels.[7] The April 23 order also

---

6. There already existed a 16¢ per gallon excise tax on gasoline. The new excise was in addition to that. The new tax is adjusted monthly inversely to the rise or fall in world crude prices, based on specified oil industry indices from two months preceding the month of the tax. For example, the amount of tax imposed during March would be determined using world price data from the preceding January. In March 1986, the additional tax was approximately 4¢ per gallon. In April, the tax rose to almost 12¢ per gallon, and in May, to over 14¢ per gallon.

7. DACO issued two orders on April 23, one directed to Phillips and Careco, Puerto Rico's two refiners, and one directed to the ten companies doing business as wholesalers. The refiners'

order required only that the companies notify the Secretary if they changed the method used to determine price. (The refiners set their selling prices using a formula based on world oil prices.) The order further allowed refiners to pass the cost of the new excise tax through to wholesalers. The refiners previously had charged prices including a mark-up for the new excise tax for gasoline which they had in inventory before the new tax was enacted. Consequently, the April 23 order also established a scheme whereby the refiners had to reimburse wholesalers for the excess charges on pre-excise tax inventory.

The second order, directed to wholesalers, provided:

scheduled a public hearing to address the appropriate form for future regulation, which was held on May 12.

On April 28, 1986, the two newest and smallest wholesalers, Tenoco and Coqui, petitioned the Secretary for reconsideration of the April 23 order.[8] To maintain their competitive position, Tenoco and Coqui historically had charged lower prices than the other wholesalers in Puerto Rico and consequently were limited by the April 23 order to selling gasoline at prices lower than those charged by the other wholesalers. The next day, April 29, DACO issued an order rescinding the April 23 order as it applied to Tenoco and Coqui. Instead, because DACO found that Tenoco and Coqui had not exceeded the informal 8.6¢ per gallon gross profit margin, the April 29 order allowed Tenoco and Coqui to raise their prices to the same level as prices charged by other wholesalers under the April 23 order, subject to the further provision that Tenoco and Coqui could not achieve a gross profit margin of more than 8.6¢ per gallon.

Soon after the Secretary had issued the April 23, 1986 orders, world oil prices rose. With their selling prices frozen, and DACO's prohibition against passing through the new excise tax, many wholesalers were forced to charge prices for gasoline *below* their acquisition costs. By early May, refiners and wholesalers filed eight separate complaints in the United States District Court for the District of Puerto Rico, alleging that the Secretary's orders violated Puerto Rico statutory and constitutional law, as well as provisions of the federal Constitution, including the due process and takings clauses.[9]

Among the wholesalers filing suit were Tenoco and Coqui. They contended that the relief provided by the April 29 order was inadequate. On May 5, Tenoco and Coqui requested a temporary restraining order. The district court denied the request and directed Tenoco and Coqui to participate in the May 12 hearing to be held by DACO. Tenoco and Coqui petitioned the Secretary to reconsider his April 29 order, and they both participated in the May 12 hearing. The other oil companies, however, boycotted the May 12 hearing.

On May 9, the district court issued an order directing the Secretary to appear before the court on May 21 to show cause why the preliminary injunction sought by two plaintiffs, Caribe and Texaco, should not be entered. On May 14, the district court issued an order consolidating all eight actions against the Secretary. On that same day, Tenoco and Coqui again sought a temporary restraining order,

---

From this day, the maximum price at which gasoline may be sold to retailers shall not exceed that which was offered by the firm to its customers as of March 31, 1986. I [sic] shall not be possible to increase the price to retailers without the express permission of the Secretary of Consumer Affairs. The retailers shall not have to pay any increase that is not expressly authorized. Any losses produced by denying the authorization shall be charged to the profits obtained for the first quarter of this year.

8. Any party "adversely affected" by a decision of DACO's Secretary may petition within ten days for reconsideration. P.R.Laws Ann. tit. 3, § 341*o* (1982). The Secretary has 30 days to respond. A party who is adversely affected after the Secretary's reconsideration may petition for relief within 15 days of the Secretary's decision to the Superior Court of Puerto Rico. P.R. Laws Ann. tit. 3, § 341p (1982).

9. The Supreme Court has held that one or another or both of the Constitution's two due process clauses (that in the Fifth Amendment and that in the Fourteenth) apply to Puerto Rico even though the latter is not a state. *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 668–69 n. 5, 94 S.Ct. 2080, 2084–85 n. 5, 40 L.Ed.2d 452 (1974).

The Supreme Court has not ruled definitely on the application to Puerto Rico of the takings clause of the Fifth Amendment, which provides that "private property [shall not] be taken for public use without just compensation," U.S. Const., Amend. 5. *But see Webb's Fabulous Pharmacies v. Beckwith,* 449 U.S. 155, 159, 101 S.Ct. 446, 449–50, 66 L.Ed.2d 358 (1980) ("takings" clause incorporated into the Fourteenth Amendment, applicable to the states). We have no doubt, however, that the takings clause, like the due process and equal protection clauses, applies to the Commonwealth of Puerto Rico. *See, e.g., Culebras Enterprises Corp. v. Rivera Rios,* 813 F.2d 506 (1st Cir.1987) (assuming applicability). *See generally* J.R. Torruella, *The Supreme Court and Puerto Rico: The Doctrine of Separate and Unequal* (1985).

alleging that the May 12 hearing was not responsive to their petition for reconsideration. They complained that DACO's Secretary conducted the hearing as if it was intended only to gather information relevant to future regulation, instead of adjudicating the merits of Tenoco's and Coqui's petitions for reconsideration. On the next day, May 15, the district court again denied Tenoco's and Coqui's request for a temporary restraining order, but ordered DACO to rule on their requests for reconsideration of the April 29 order.

On May 16, on its own motion, the district court consolidated the hearing on the preliminary injunction motion with the trial on the merits, scheduled for May 21. The court scheduled a pretrial conference for the day preceding trial. On May 20, the morning of the pretrial conference, DACO issued an entirely new price order which rescinded the April 23 price freeze and established, in its place, maximum gross profit margins for wholesalers and retailers. At the pretrial conference, the district court deemed all the complaints amended to include a challenge to the new May 20 order, as well as to the earlier orders. Beginning the following morning, the district court conducted a three-day bench trial, limited to the prayers for injunctive and declaratory relief.

The new May 20 price order divided gasoline wholesalers into two classes: those which in DACO's view had obtained profits in excess of 8.6¢ per gallon during the first quarter of 1986, and those smaller wholesalers, such as Tenoco and Coqui, which had not. The order established a gross profit margin limit for the first group of 3.6¢ per gallon, and for the second group of 8.6¢ per gallon.[10] Companies limited to 3.6¢ per gallon were allowed to petition for membership in the 8.6¢ group, upon a showing that the company had attained an average gross profit margin of 8.6¢ for the 1986 calendar year, taking into account the

company's supposedly inflated first quarter gross profit margins. The order allowed gasoline retailers a 17.7¢ per gallon gross profit margin. Any company adversely affected by the order was permitted to file a request to the Secretary for special relief from the order. The order provided that the Secretary would hold a hearing on any request for special relief within five days of receiving the request. The order also scheduled for June 2, 1986 a public hearing before the Secretary. The stated purpose of the hearing was "to receive comments from all interested persons on the adequacy of this Temporary Order and on any modifications that should be made to attain a situation where primary reliance can be placed on competitive market forces to maintain fair margins at all levels of distribution and fair prices for the consumer."

## II.  THE DECISION BELOW

The district court issued its opinion and order on June 4, 1986, ruling that DACO's actions constituted, inter alia, a violation of plaintiffs' substantive due process rights.[11] In accordance with its ruling, the district court issued a sweeping injunction, prohibiting DACO from "further implementing or enforcing orders fixing prices or margins of profit in the gasoline wholesale and retail business other than in accord with federal law as described in [the district court's 41–page opinion]." 640 F.Supp. at 515.

The district court's opinion extensively discussed DACO's activities in the field of gasoline price regulation, making findings of fact regarding the effect of DACO's actions on individual oil companies' financial positions. The April 23, 1986 price freeze, when coupled with the effect of the new excise tax and the rise in world prices, was found to have caused at least some wholesalers to sell below their acquisition

10.  The order also purported to grant temporary credits of 5¢ and 10¢ per gallon. It was never clear how this scheme was supposed to work, or whether DACO has the authority to provide such funds to oil companies.

11.  The district court also ruled that DACO's regulation was preempted by a federal policy of deregulation. That ground for issuing injunctive relief subsequently was reversed by the Supreme Court of the United States. See note 1, supra.

costs.[12] The district court similarly found that the May 20 order limiting gross margins to 3.6¢ and 8.6¢ per gallon restricted the wholesalers to returns on investment below what was fair and reasonable.[13]

The court rejected DACO's contention that it should abstain under the *Younger, Pullman* or *Burford* abstention doctrines from adjudicating plaintiffs' constitutional claims. Concluding that DACO's price orders lacked "minimum rationality," the district court held they were a substantive violation of the due process clause. The court characterized the price orders as politically motivated and lacking in procedural safeguards. The orders were said to so reduce the companies' margins as to "confiscate" their property. The district court held that the oil companies had a "reasonable expectation of a return on investment," and that DACO had disregarded this. 640 F.Supp. at 505.

**12.** The district court found that the effect of the April 23 price freeze order was to force the wholesalers Careco, Texaco, Shell, Mobil and Esso to sell gasoline at prices lower than the cost to the companies to acquire the gasoline. For example, in early May, Careco was found to have sold gasoline for 17¢ per gallon *less* than its *acquisition cost* as a result of the April 23 order. DACO concedes on appeal that rising world market prices during the final days of the April 23 price freeze order forced some wholesalers to sell below cost during that latter period.

**13.** The court found that the May 20, 1986 order caused certain gasoline wholesalers to sell gasoline at a loss. Even where the May 20 order allowed oil companies to recoup their acquisition costs, the court concluded that the 3.6¢ and 8.6¢ gross profit margin limits were inadequate to cover the companies' operating costs and provide for a reasonable profit. The district court found that Esso and Texaco would suffer losses as a result of the 3.6¢ per gallon gross profit margin limit because that figure did not allow them to recover their operating costs, which the court determined were 11¢ per gallon for Esso and over 3.6¢ per gallon for Texaco, let alone receive a fair return on investment. Shell and Mobil would suffer "daily" [sic] losses of $110,000 and $59,000, respectively (the evidence indicates that these figures should be "weekly," not "daily") under the 3.6¢ limit. The companies' evidence at trial indicated that Shell's operating costs were 8¢ per gallon and Mobil's were 10¢ per gallon. Careco's operating costs were 7.5¢ per gallon, the court found, which Careco could not recover under the 3.6¢ limit. The

## III.  DISCUSSION

### A.  *Scope of Review*

■ Our appellate jurisdiction rests upon 28 U.S.C. § 1292(a)(1) (1982), which authorizes interlocutory appeals from injunctions. Besides injunctive relief, plaintiffs below also sought damages, but the district court deferred action on the damages claims, which remain unresolved. The only issues on appeal, therefore, concern the granting of the permanent injunction.

The district court's opinion and order granting injunctive relief referred to the unreasonableness of DACO's orders of March 26, April 23, and April 29, as well as of the order of May 20, 1986. By the time of the trial, however, the May 20 order establishing gross profit margins for wholesalers and retailers was the *only* price order in effect.[14] If plaintiffs were

court also found that even under the 8.6¢ gross profit margin Careco would lose money because the company's return on investment would only be five percent. A reasonable return on investment in the oil industry is ten percent, the court found.

The court went on to find that the May 20 order's interference with market forces imposed losses on even those remaining companies whose operating costs were more easily encompassed within the imposed gross profit margin. For example, Tenoco, limited by the May 20 order to a gross profit margin of 8.6¢ per gallon, conceded that it historically earned a gross profit margin of 3¢ per gallon. The court found, however, that the limits on other companies forced Tenoco, a small company dependent upon competitive pricing, to keep its prices below those of other wholesalers. The district court believed that while DACO's regulation did not force losses on Tenoco by governmental compulsion, as it did other wholesalers, the May 20 order forced Tenoco to sell at a loss due to the exigencies of business in light of the regulation's effect on the other wholesalers.

**14.** The March 26, 1986 order had simply restated Regulation 45, Article 3, the interim provision requiring oil companies to notify DACO before raising gasoline prices. Article 3 was, by its own terms, effective only until the Secretary issued a price order pursuant to Article 4 of the regulation. Thus, upon DACO's promulgation of the April 23 price orders, both Article 3 and the March 26 order ceased to have any effect.

The May 20 order expressly stated "the Temporary Order on Maximum Prices and Profit Margins of April 23, 1986 applicable to whole-

entitled to injunctive relief, therefore, it was because of the unconstitutionality of, and harm done by, the May 20 order. Defects in the superseded earlier orders were not grounds for injunctive relief absent any imminent threat to reinstate them. *See County of Los Angeles v. Davis,* 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979); *United States v. W.T. Grant Co.,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) (rescinded orders moot if "there is no reasonable expectation that the wrong will be repeated"). No such threat was suggested. Accordingly, while the earlier orders may be relevant to shed light on DACO's course of conduct, plaintiffs' right to an injunction must ultimately stand or fall on the legality and harmfulness of the May 20, 1986 order alone.

### B. *Preliminary Analysis*

Plaintiffs' most telling claim of unconstitutionality rests on the lower court's findings, made after a three-day trial, that the 3.6¢ and 8.6¢ maximum gross margins set by DACO in its May 20 order were "confiscatory." The court found that these margins denied to certain of the gasoline wholesalers a return sufficient even to cover operating costs, and denied to others at least a reasonable return on investment. *See* note 13, *supra.*

The findings of confiscation are serious because of the rule, established in a line of utility ratemaking cases, that regulated rates must be "just and reasonable" in order to be constitutional. *See, e.g., Duquesne Light Company v. Barasch,* —— U.S. ——, 109 S.Ct. 609, 615–16, 102 L.Ed.2d 646 (1989); *FPC v. Natural Gas Pipeline Co.,* 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942); *Jersey Central Power & Light Co. v. FERC,* 810 F.2d 1168, 1175 (D.C.Cir.1987). To be just and reasonable, rates must provide not only for a company's costs, but also for a fair return on investment. *See Barasch,* 109

S.Ct. at 616; *Permian Basin Area Rate Cases,* 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968). Rates which fall below this standard are "confiscatory." *Barasch,* 109 S.Ct. at 615; *FPC v. Natural Gas Pipeline Co.,* 315 U.S. at 585, 62 S.Ct. at 742. From its findings that the maximum gross profit margins allowed by DACO were "confiscatory," the district court concluded that the price controls were so arbitrary and unreasonable as to violate the due process clause of the federal Constitution. 640 F.Supp. at 506.

There is, however, an initial difficulty with the district court's approach. The constitutional requirement that rates be just and reasonable has apparently moved from the protection of the due process clause to that of the takings clause. *See Barasch,* 109 S.Ct. at 615–16 ("If the rate does not afford sufficient compensation, the state has taken the use of utility property without paying just compensation...."). This shift may reflect the reduction since the mid–1930s in the role of the due process clause as an instrument of judicial oversight of economic regulation. *See* L. Tribe, *American Constitutional Law* 581–86 (2d ed. 1988). A state regulation that interferes too greatly with an owner's economic use of property has come to be viewed as a taking that requires the state to furnish just compensation. *Id.* at 595–96. *See, e.g., Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). Thus, the takings clause imposes limits on the proper scope of rent control programs as well as on traditional rate making. *See Pennell v. City of San Jose,* 485 U.S. 1, 108 S.Ct. 849, 856, 99 L.Ed.2d 1 (1988). By the same token, the takings clause prevents states (unless they offer other means of compensation to sellers) from imposing price controls capping prices below just and reason-

---

salers is hereby rescinded." The May 20 order also superseded the April 29 order applicable to Tenoco and Coqui. Finally, the May 20 order superseded the April 23 order applicable to refiners (which provided only that refiners could not change the *method* of computing prices

without notifying DACO), decreeing that refiners might continue to sell to wholesalers using the existing method for calculating prices. Accordingly, the sum of DACO's current gasoline price regulatory scheme was expressed by the May 20 order alone.

able levels. *See Barasch,* 109 S.Ct. at 615–16. This is not to say the due process clause has lost all significance in this context. But its focus may now be less on the economic adequacy of the permitted prices than on whether a program's procedures are inadequate or whether, overall, a program is arbitrary, discriminatory or irrelevant to a legitimate legislative goal. *See Pennell,* 108 S.Ct. at 857.

DACO contends that today's diminished role of the due process clause invalidates the finding here of a constitutional violation. However, if a finding of unconstitutionality is justified under takings rather than due process principles, the injunction may still stand. Accordingly, we must examine the lower court's determination under both clauses of the Constitution, recognizing that analysis under the takings clause may be different from that under the due process clause. *See Nollan v. California Coastal Commission,* 483 U.S. 825, 107 S.Ct. 3141, 3147 n. 3, 97 L.Ed.2d 677 (1987) ("Our verbal formulations in the taking field have generally been quite different [from those applied to due process challenges]."). We examine the lower court's ruling under, first, the due process clause, and, second, the takings clause.

### C. *The Due Process Clause*

■ Since 1937, when "substantive" due process lost favor, courts have reviewed economic legislation with great deference to the legislature's policies, viewing the legislature rather than the judiciary as best suited to the making of economic policy. *Ferguson v. Skrupa,* 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963). A regulation takes property without due process of law only if " ' "arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt...." ' " *Pennell v. City of San Jose,* 108 S.Ct. at 857 (quoting *Permian Basin Area Rate Cases,* 390 U.S. 747, 769–70, 88 S.Ct. 1344, 1361, 20 L.Ed.2d 312 (1968) (quoting *Nebbia v. New York,* 291 U.S. 502, 539, 54 S.Ct. 505, 516–17, 78 L.Ed. 940 (1934))). The regulation will stand if a rational relationship exists between it and a legitimate governmental ob-

jective. *Nebbia,* 291 U.S. at 537, 54 S.Ct. at 516.

For due process purposes, therefore, we examine the May 20, 1986 order, and the related price control scheme, in light of all the relevant surrounding circumstances, asking if any reasonably conceivable set of facts could establish a rational relationship between them and the Puerto Rico government's legitimate ends. *See Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *United States v. Carolene Products,* 304 U.S. 144, 154, 58 S.Ct. 778, 784–85, 82 L.Ed. 1234 (1938). So analyzed, and putting aside for the moment the matter of the alleged confiscatory nature of the gross margins established in the May 20 order, we perceive no due process problem. A due process violation would not occur simply because, in a court's view, DACO's program was the product of "political" motives. Puerto Rico was entitled to regulate gasoline prices, whatever the court's perception of its "real" reasons for so acting, so long as rational reasons existed for Puerto Rico to have imposed controls. "Under the system of government created by our Constitution, it is up to legislatures, not courts, to decide on the wisdom and utility of legislation.... The doctrine that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely—has long since been discarded...." *Ferguson v. Skrupa,* 372 U.S. at 729–30, 83 S.Ct. at 1030–31. "[I]t is, by now, absolutely clear that the Due Process Clause does not empower the judiciary 'to sit as a "superlegislature to weigh the wisdom of legislation." ' " *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 124, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91 (1978) (quoting *Skrupa,* 372 U.S. at 731, 83 S.Ct. at 1031–32) (rejecting due process challenge to state petroleum regulations).

■ In the present case, it was possible for rational people to believe that middlemen in Puerto Rico were overcharging retailers for gasoline and reaping inflated profits. Rational people could have thought (whether or not wisely is beyond our purview) that wholesaler price controls

were a desirable way to protect ultimate consumers by keeping retailer acquisition costs down. It is beyond dispute that Puerto Rico may legitimately regulate the prices of staples like gasoline if it thinks that the public interest requires. *See Pennell v. City of San Jose,* 108 S.Ct. at 857; *FCC v. Florida Power Corp.,* 480 U.S. 245, 253, 107 S.Ct. 1107, 1113, 94 L.Ed.2d 282 (1987); *Permian Basin Area Rate Cases,* 390 U.S. at 768, 88 S.Ct. at 1360 ("A legislative power to create price ceilings has, 'in countries where the common law prevails,' been 'customary from time immemorial....'") (quoting *Munn v. Illinois,* 94 U.S. 113, 133, 24 L.Ed. 77 (1876)); *Nebbia v. New York,* 291 U.S. at 530, 54 S.Ct. at 513.

Turning to the specifics of the May 20, 1986 order (but putting aside, for the moment, the alleged inadequacy of the 3.6¢ and 8.6¢ margins), we cannot say that the order was not rationally related to Puerto Rico's legitimate interest in protecting consumers from artificially inflated gasoline prices.[15] The order puts a cap on the oil companies' profits, protects retailers from higher prices, and arguably protects the gasoline buying public from inflated prices at the pump. While the federal government, in abandoning gasoline price controls in 1981, indicated a loss of confidence in regulation, the Puerto Rico government was entitled to take a different view, given a perception that suppliers were overcharging in the local market.

DACO's *method* of regulation—using a maximum gross profit margin—was not unreasonable. This was modeled on the federal government's earlier use of a similar mechanism in regulating the prices of gasoline products. The method allows oil companies to recoup their acquisition costs and any excise taxes imposed on the gasoline. It then adds an amount (the gross profit margin) intended to be sufficient for the wholesalers to recover both operating costs and a return on investment.[16] Setting a fixed amount to cover both operating costs and profit arguably reflects sound regulatory policy because it eliminates elaborate reporting and accounting of operating costs *and* encourages companies to keep down their operating costs. The method is simple to calculate and enforce, since acquisition costs, excise taxes, and selling prices tend to be public knowledge.

The regulatory approach so far described was, therefore, rational and consistent with due process. The district court, however, found that the margins established by DACO—3.6¢ for certain wholesalers and 8.6¢ for others—were irrational and confiscatory. The question arises whether, on this account, the price control scheme was violative of due process.

As already indicated, the Supreme Court's approach in recent times has been to treat an alleged inadequacy in rates as violative of the takings, rather than the due process, clause. *See Duquesne Light Co. v. Barasch,* 109 S.Ct. at 615–16; *Pennell v. City of San Jose,* 108 S.Ct at 856–59. We think, therefore, that the issue of the inadequacy of the rates here is best addressed under the takings clause.

---

**15.** The burden of proving the irrationality necessary to sustain a due process challenge rests on the party asserting the violation, in this case the plaintiff oil companies. *See National Railroad Passenger Corp. v. Atchison, Topeka & Santa Fe Railway Co.,* 470 U.S. 451, 477, 105 S.Ct. 1441, 1457, 84 L.Ed.2d 432 (1985) (citing *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729, 104 S.Ct. 2709, 2717–18, 81 L.Ed.2d 601 (1984)). The burden of establishing such unreasonableness as to deny due process of law is not easily met. For the last half-century, courts have upheld challenged governmental acts unless no reasonably *conceivable* set of facts could establish a rational relationship between the regulation and the government's legitimate ends. *See Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed.

563 (1955); *Carolene Products,* 304 U.S. at 154, 58 S.Ct. at 784.

**16.** Portions of the district court's opinion imply that DACO's regulation differs from federal regulation in that it does not allow wholesalers to recover excise tax payments. Although it is true that the April 23 price freeze prevented wholesalers from passing through the new excise tax, it is not true that the May 20 order prevents wholesalers from recovering taxes paid on the gasoline. To the contrary, the May 20 order allows wholesalers to recover all of their acquisition costs, including taxes, in addition to the amount specified as the maximum gross profit margin.

We are frankly not sure to what degree a deficiency in the allowed rates might also implicate the due process clause. As recently as the early 1950s, this court overturned as violative of due process a Puerto Rico price control regulation requiring dealers to sell rice below cost. *Mora v. Mejias*, 223 F.2d 814 (1st Cir.1955) ("*Mora* II"). Price controls imposing confiscatory ceilings and having the effect of driving gasoline wholesalers from the Puerto Rico market might perhaps be deemed so irrational as to exceed legislative power, constituting a taking without due process as well as one without just compensation. *See also Calfarm Insurance Co. v. Deukmejian*, 48 Cal.3d 805, 821, 258 Cal.Rptr. 161, 169–70, 771 P.2d 1247, 1255–56 (1989) (invalidating facially confiscatory insurance rate reduction under due process clause). But recent cases from the Supreme Court seem to suggest a strong preference for a takings analysis in such a situation. We see, moreover, little practical difference in outcome between a due process analysis focusing upon the alleged inadequacy of DACO's margins and our takings clause analysis below. A key factor in the latter analysis is our conclusion that plaintiffs' failure to pursue available administrative steps to have the order modified precluded them from claiming a takings clause violation. The exact same factor would, in our view, bar a due process claim. *See Williamson Planning Commission v. Hamilton Bank*, 473 U.S. 172, 199–200, 105 S.Ct. 3108, 3123, 87 L.Ed.2d 126 (1985) (prematurity of claim applicable under either clause).

We, therefore, see no need to inquire further under the heading of due process. Insofar as the issue is the confiscatory character of DACO's imposed margins, this is best pursued in the following section of the opinion relating to the takings clause. As for the other elements of plaintiffs' due process challenge, we reject them for the reasons given above.[17]

### D. *Takings Clause*

We turn now to the question whether the May 20, 1986 order confiscated plaintiffs' property in violation of the takings clause. As already discussed, plaintiffs may not constitutionally be subjected to controls which depress the prices they may charge below just and reasonable levels, at least in the absence of an adequate remedy under Puerto Rico law to secure to them just compensation for the "taking" which such a regulation would impose. *See Barasch*, 109 S.Ct. at 615–16 (applying takings clause's requirement for just rates to challenged utility rate); *Williamson Planning Commission v. Hamilton Bank*, 473 U.S. at 194, 105 S.Ct. at 3120 (takings clause requires government to provide a reasonable, certain and adequate procedure for obtaining compensation). The district court found that the May 20 order was confiscatory in that it does not allow some oil companies to recover their total operating costs and denied to them a fair return on investment.

The record upon which the district court made these findings was produced at a pressured three-day trial in which the plaintiff oil companies utilized proceedings in court rather than before the relevant administrative agency to develop a record for opposing the margins promulgated by DACO in the May 20 order. What emerges is the picture of a sketchy economic basis for DACO's adoption of the 3.6¢ and 8.6¢ margins, and a not very informative economic presentation by plaintiffs as to their basis for opposition.

DACO justified initially restricting certain firms to only a 3.6¢ margin on the ground that their earnings had been vastly inflated during the first quarter of 1986. The 3.6¢ margin was intended to eventuate in an average overall 8.6¢ margin for the entire year of 1986. The May 20 order provided that wholesalers initially limited

---

17. We add that, contrary to the lower court's views, we find no lack of procedural due process in the procedures which the Puerto Rico statute and the challenged order afford to wholesalers to secure review of the price orders. As discussed in Section III–D below, companies adversely affected by price orders may appeal to DACO. The statute provides further review procedures. *See* note 8, *supra*. There is no evidence that DACO failed to adhere to these procedures.

to the 3.6¢ per gallon gross profit margin could petition for an increase to 8.6¢ when they could show this would not result in an annual margin that exceeded 8.6¢ per gallon. Thus, DACO contends that the sole question is the propriety of its imposing an 8.6¢ margin. DACO's justification for imposing an *8.6¢* margin is that this was the federal government's gasoline wholesaler margin imposed in 1981 (until discontinuation of federal controls) throughout the United States and Puerto Rico. DACO argues that the Puerto Rico wholesalers presented no evidence to indicate that events had occurred since 1981 making the 8.6¢ gross margin any less appropriate in 1986 than it was in 1981. DACO tendered economic evidence to the effect that there had, in general, been no serious inflation of costs in Puerto Rico between 1981 and 1986. Also, DACO's Secretary testified, without supporting data, that on the mainland the 8.6¢ margin or less still prevailed in an unregulated market.

The above strikes us as a weak basis for a state agency to adopt the most critical figure in its arsenal for regulating a vital industry. By 1986, the 8.6¢ figure, last used by federal authorities in 1981, was five years old. The federal regulators had regularly used then current nationwide economic data to update their margins, the 8.6¢ figure in 1981 being the most recent product of such efforts. That a figure devised in 1981 for regulating gasoline wholesaler prices throughout the United States and Puerto Rico (taken as a whole) would still be the right one for regulating prices in 1986 in *Puerto Rico alone* is by no means obvious. One would have expected the agency to be able to support such an essential figure by specific economic data projecting the wholesalers' reasonable operating costs and a fair return on investment for the year in question, 1986. DACO made no presentation of such data, arguing that it was up to the companies to prove the reasonableness of their purported costs given the fact that the 8.6¢ figure had stood up in 1981 and was still, allegedly, valid on the mainland.

Plaintiffs' data as to the purported operating costs and profits of each of the wholesalers also left many questions. Two wholesalers, Esso and Mobil, presented evidence that their actual operating costs on the island were in excess of 8.6¢ per gallon. Several others demonstrated operating costs *less* than 8.6¢ per gallon—Shell's were ostensibly 8.0¢, Careco's were 7.5¢, and Tenoco's were 3.0¢. Evidence as to other members of the industry was inconclusive; we know only that Texaco's operating costs were more than 3.6¢ per gallon, and have no evidence concerning Gasolinas, Isla, or Coqui. Whether and why these figures were higher than mainland operating costs—as DACO insisted—was not developed, nor was it explained how the companies had survived in the earlier era under the 8.6¢ margin.

■ We need not consider whether, on the basis of such a record, it was possible for the court to make a reasoned judgment as to whether the 3.6¢ and 8.6¢ margins were confiscatory. Even assuming the margins in question were, as the judge found, too low to permit a fair and just return for the wholesalers, we conclude that the court below acted prematurely in determining that DACO's actions were unconstitutional.

The Supreme Court has ruled that "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Planning Commission v. Hamilton Bank*, 473 U.S. at 186, 105 S.Ct. at 3116. In *Williamson Planning Commission*, the developer of a residential subdivision sued a local planning commission in the federal district court, alleging that the commission's application to it of zoning laws and land use regulations amounted to a taking without just compensation. The Supreme Court held that the developer's money damages claim was premature because the developer had not sought variances from regulations which precluded approval of a preliminary plat. The Court explained,

[o]ur reluctance to examine taking claims until such a final decision has been made is compelled by the very nature of the inquiry required by the Just Compensation Clause. Although "[t]he question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty," this Court consistently has indicated that among the factors of particular significance in the inquiry are the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations. Those factors simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular [property] in question.

*Williamson Planning Commission,* 473 U.S. at 190–91, 105 S.Ct. at 3118–19 (citations omitted). Until the local commission refused the developer the necessary variances, the Court reasoned, it would be impossible to ascertain whether plaintiff "will be unable to derive economic benefit" from the property.

The Court distinguished its ruling in *Williamson Planning Commission* from a requirement to exhaust administrative remedies. *Id.* at 192–94, 105 S.Ct. at 3119–20. *See Patsy v. Florida Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). The Court stated that "[t]he question whether administrative remedies must be exhausted is conceptually distinct ... from the question whether an administrative action must be final before it is judicially reviewable." 473 U.S. at 192, 105 S.Ct. at 3119. The finality requirement, the Court said,

is concerned with whether the *initial* decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate.

473 U.S. at 193, 105 S.Ct. at 3120 (emphasis added). The Court illustrated the difference by comparing the procedures which it required the plaintiff to follow before the takings claim would be ripe with the procedures which, under *Patsy,* plaintiff would not have to exhaust. The plaintiff was not required, before bringing its claim in federal district court, to avail itself of clearly remedial procedures such as those for seeking a declaratory judgment regarding the validity of zoning and planning actions taken by local officials and those for seeking review of the Commission's action by the Zoning Board of Appeals, because those procedures would result in a judgment whether the Commission's actions violated any of the developer's rights.

"In contrast, resort to the procedure for obtaining variances would result in a conclusive determination by the Commission whether [the desired development could proceed]. The Commission's refusal to approve the preliminary plat does not determine that issue; it prevents [the developer] from developing the subdivision without obtaining the necessary variances, but leaves open the possibility that [the developer] may develop the subdivision according to its plat after obtaining the variances."

*Id.* 473 U.S. at 193–94, 105 S.Ct. at 3120.

Similarly, plaintiffs here have brought this suit before DACO, the initial decisionmaker, reached a final, definitive decision concerning applicability of the 8.6¢ gross profit margin limitation and the subsidiary 3.6¢ margin. The May 20 order, entitled "Temporary Order," recites that it is "taken immediately for the purpose of making appropriate adjustments to the April 23, 1986 orders." The order goes on to say that "[t]he situation will be under continuous review and further adjustments will be made as circumstances warrant." The order continues,

Companies adversely affected by this order may file promptly with the Department a request for special relief from this Temporary Order. A hearing shall be scheduled during which the affected company can present its case for special relief within five (5) business days after

the date of receipt of said request. A company seeking such relief shall submit to the Department, during such hearing, detailed evidence of its costs, including operating costs and such other information as it wishes to present in support of its request.

The order also scheduled a public hearing for June 2, 1986,

to receive comments from all interested persons on the adequacy of this Temporary Order and on any modifications that should be made to attain a situation where primary reliance can be placed on competitive market forces to maintain fair margins at all levels of distribution and fair prices for the consumer....

The availability of these hearings, particularly the five-day adjudicative-type hearing, indicates that DACO had not yet definitively limited plaintiffs to a specified gross profit margin. "A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285 (1986). Determining whether DACO's price order provides "just and reasonable," and thus non-confiscatory, rates is an "essentially ad hoc, factual inquir[y]," *see Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979), dependent on factors such as whether each wholesaler is operating in an economically efficient manner and whether the imposed margin provides a reasonable return on each wholesaler's investment in the industry. *See Hutton Park Gardens v. Town Council*, 68 N.J. 543, 557, 350 A.2d 1, 14 (1975) ("[i]n ordinary circumstances, price controls which do not permit an economically

efficient operator to obtain a 'just and reasonable' return on his investment are deemed confiscatory.") (due process challenge). DACO has acknowledged that perhaps the 8.6¢ margin is too low for some of the larger wholesalers in Puerto Rico, and has suggested a willingness to adjust the price order upon receipt of evidence to that effect. Until the wholesalers have requested and been refused relief pursuant to the procedures provided in the May 20 order, a federal court could not know whether DACO's regulation confiscates their property.

It is true that the May 20 order was effective immediately, and in that respect was a "final" order until DACO amended it or granted an exemption from it. While in effect, the particular gasoline sold thereunder would have to be sold at prices which the district court has deemed "confiscatory." This raises the question whether in price control cases the regulated entity's right to a just and reasonable rate is such that the imposition of any disputed rate, even a temporary one, gives rise instantly to a federal right of action under section 1983. We think the answer must be "no." [18] Even though the land at issue in *Williamson Planning Commission* may have been rendered useless (and perhaps valueless) for the duration of the time period needed to apply for a variance,[19] the Supreme Court refused to consider whether the land had been taken in violation of the Constitution until the plaintiff had exhausted the possibilities that the Commission's edict was not final. Thus, so long as the regulation does not finally take the plaintiff's property, and provides a reasonable means for seeking amendment of the initial action,[20] state administrative action

---

18. In *Pennell v. City of San Jose* the Court dismissed as premature a takings challenge to San Jose's rent control ordinance. 108 S.Ct. at 856–57. The Court declined to rule on the takings question because the ordinance allowed but did not require the hearing officer to impose less than reasonable rates, and there was no showing that any confiscatory rates had in fact been imposed. *Id.* at 857. While a very different case from *Williamson Planning Commission* (and the present), *Pennell* reflects the Court's continuing reluctance to treat incomplete action as a taking.

19. Indeed, the mortgagee foreclosed on the original developer in *Williamson Planning Commission*.

20. The Supreme Court subsequently has held that damages are retrospectively available for the period of "temporary" takings, *i.e.*, regulatory takings ultimately invalidated as unconstitutional by the courts. *See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 107 S.Ct. 2378, 2389, 96 L.Ed.2d 250 (1987). The concept of a temporary taking does not extend, however, to "nor-

which temporarily limits the use or value of property is not yet ripe for a takings claim.

Of course, the reasonableness of a procedure for seeking exemption from or alteration of a regulation which may temporarily confiscate property will depend upon the nature of the regulation, the length of the delay and the impact on a citizen of the challenged order. The question of how long gasoline wholesalers need suffer alleged confiscatory rates while seeking local relief is contextually different from how long a developer must suffer delay before obtaining land use permits. A price regulation which forces wholesalers to sell gasoline for a price which does not cover operating costs and a reasonable profit may, in short order, become so onerous that the wholesalers will be unable ever to recover their earlier cumulative losses through subsequent price increases and may be forced out of business.[21] In such a situation, no subsequent modification of the order will effectively restore value to the investment the wholesaler made in the oil industry and the agency's initial action is, for all practical purposes, rendered final. But, while there may be extreme circumstances when a federal court can and should grant temporary injunctive relief pending completion of agency action, this is not such a situation.

Here, the May 20 order provided for a hearing within five days of an oil company's petition. We think the five-day deadline adequately protected against the possibility that DACO's "Temporary Order" would continue unreasonably. Assuming DACO were to rule with reasonable promptness thereafter, the duration of the review period compares very favorably indeed to periods of delay that have been endorsed in the context of land use regulation, rental control and utility ratemaking. *See First English Evangelical Lutheran Church of Glendale,* 107 S.Ct. at 2389 ("normal delays in obtaining building permits, changes in zoning ordinances, variances and the like" do not constitute a taking); *Fisher v. City of Berkeley,* 37 Cal.3d 644, 693 P.2d 261, 264, 209 Cal.Rptr. 682, 719 (1984) (120–day delay in rent control board decision not confiscatory), *aff'd on other grounds,* 475 U.S. 260, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986); 16 U.S.C. § 824d(e) (1982) (FERC may suspend proposed new rates, if it provides a reason in writing, for a period not longer than five months). *Cf. Calfarm,* 48 Cal.3d at 818–26, 258 Cal.Rptr. at 168–70, 771 P.2d at 1254–56 (one year too long for insurance rates). While any delay in providing relief from price controls of this kind may in some instances be detrimental, we also note that the oil industry in Puerto Rico is not without economic power of its own, and that for Puerto Rico to be able to impose controls, it must have leeway to engage in economic give and take with sellers. To treat every claim of confiscation by a seller as triggering an immediate issue for federal court intervention would be nearly to eliminate a state's rightful hegemony in this area.

A state is entitled to compel sellers to cooperate by presenting their best economic case to the price-setting agency and seeking relief there prior to turning to the federal court. Not only may the agency make appropriate changes, a court will be

mal delays in obtaining building permits, changes in zoning ordinances, variances and the like." *Id.*

**21.** It can be argued that wholesalers may choose, over the duration of price controls, to abstain from selling gasoline and thus will not suffer any losses. A number of courts have distinguished government regulation, including rent control, from utility ratemaking on the ground that the regulated entity may leave the business. *See, e.g., Bowles v. Willingham,* 321 U.S. 503, 517, 64 S.Ct. 641, 648, 88 L.Ed. 892 (1944); *Block v. Hirsh,* 256 U.S. 135, 157, 41 S.Ct. 458, 460, 65 L.Ed. 865 (1921). This sup-

posed freedom to temporarily leave the market may be largely illusory, however. Even if the wholesalers hoarded their present inventories to be sold when they could obtain a higher price, they still would have to meet their fixed costs— overhead, salaries, storage, etc. In practice, such a course might very well be economically prohibitive. *See Mora v. Mejias,* 223 F.2d 814, 817 (1st Cir.1955) (unreasonable to conclude that rice importers could withdraw from industry when rice was a staple commodity in Puerto Rico); *Hutton Park Gardens,* 68 N.J. 543, 557 n. 9, 350 A.2d 1, 14 n. 9 (1975) (reaching similar conclusion in context of rent control).

significantly aided if an administrative record is developed, revealing the basis for the agency's position. In utility ratemaking cases, where careful administrative procedures are customary (and, to be sure, more feasible), the court is ordinarily limited to determining whether a rate order's "end result" is just and reasonable, assuring itself both

> "that each of the order's essential elements is supported by substantial evidence" *and* that "the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable."

*Jersey Central Power & Light*, 810 F.2d at 1177 (D.C.Cir.1987) (quoting *Permian Basin Area Rate Cases*, 390 U.S. at 792, 88 S.Ct. at 1373. Similarly, in *Williamson Planning Commission*, the requirement that the developer seek a variance would not only insure that the Court did not needlessly make constitutional rulings, but also that the Commission be put to the test when faced with the type of evidence which would build an administrative record and provide information by which a court could evaluate the validity of the zoning ordinance's application. *See also Calfarm*, 48 Cal.3d at 825 n. 18, 258 Cal.Rptr. at 173 n. 18, 771 P.2d at 1259 n. 18. In this case, the district court was severely hampered by the absence of any record to show that DACO had considered and/or rejected the wholesalers' claims that the margin limitation was confiscatory. Once DACO conducts the promised hearing (or at least is given a fair opportunity to do so), a court can be assured that the appropriate agency has heard and considered the wholesalers' criticisms and examined its economic data. Until this occurs, the margins lack the requisite finality.

The district court should have stayed its hand to await the end result of DACO's process for establishing price controls. The district court's intervention and sweeping permanent injunction [22] did not strike the proper balance between protecting wholesalers' interests and allowing Puerto Rico reasonable leeway to engage in regulation of the gasoline industry. In 1953, this court said in *Mora v. Mejias* ("*Mora I*"), "the administrator is entitled to observe the actual result of [the regulation's] operation for a reasonable period of time, before a court could conclude that he was arbitrary or capricious in not revising the established maximum prices." 206 F.2d 377, 386 (1st Cir.1953).

This is not to say that if, as the district court obviously feared, DACO stubbornly refused to do anything more than reiterate its original price order, the court lacked the power to protect plaintiffs. If after a reasonable time following the hearings DACO did not act at all, or if its determination following the hearings appeared confiscatory and productive of irreparable harm, the court could stay the orders preliminarily. It could then proceed to review the merits of the takings claim in a less pressured atmosphere, perhaps using its influence to direct the agency and the parties to themselves first build a proper economic record in an administrative setting which the court could then review.

We hold, in sum, only that the court's intervention was too early—that given the opportunity for almost immediate administrative review, the May 20, 1986 price order did not yet amount to a taking and was not yet ripe for constitutional adjudication. Moreover, because presumptively adequate administrative review procedures were available, and DACO had, as yet, engaged in no unreasonable delays, there was no demonstrated need for injunctive relief on a temporary basis. Plaintiffs' takings claim, not being ripe for adjudication, must

**22.** Even if the matter were ripe for injunctive relief, the district court's permanent injunction is too absolute in its terms, given Puerto Rico's right—wisely or unwisely—to engage in price regulation. As the injunction is presently worded, DACO officials would likely wonder whether any form of attempted price regulation would not lead to a citation for contempt.

be dismissed for want of jurisdiction.[23] Dismissal is, of course, without prejudice.

*The injunction of the district court is vacated.*

**23.** Our ruling today that plaintiffs' claims brought under the takings clause were premature is of a different flavor than a determination that the district court should have abstained from exercising jurisdiction over plaintiffs' claims, a result which DACO alternatively urges upon us. A determination that a claim is not ripe deprives a court of jurisdiction; there is as yet no "case or controversy" as required by Article III of the federal Constitution. Abstention is a discretionary doctrine, however; courts abstain when they have jurisdiction to hear a claim, but for prudential or other reasons consider it best not to exercise their jurisdiction.

We think the district court's refusal to abstain was correct. DACO urges that the district court should have abstained pursuant to the principles of *Burford* abstention. *See Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). The *Burford* doctrine provides that federal courts should abstain when federal court intervention unnecessarily threatens to impede significantly the ongoing administration of a state regulatory system. *Bath Memorial Hospital v. Maine Health Care Finance Commission,* 853 F.2d 1007, 1013 (1st Cir.1988). *Burford* abstention does not apply, however, when the effect of an entire state regulatory scheme is challenged as unconstitutional.