Howard H. GILBERT, Jr., et
al., Plaintiffs,

v.

CITY OF CAMBRIDGE, et
al., Defendants.

Civ. A. No. 88–1255–WD.

United States District Court,
D. Massachusetts.

Aug. 9, 1990.

James D. St. Clair, Hale & Dorr, Kenneth R. Berman, Sherin & Lodgen, Boston, Mass., for plaintiffs.

Stephen B. Deutsch, Foley, Hoag & Eliot, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

Certain Cambridge property owners perceive themselves burdened by the City's decade old restrictions on the removal of rental units from the rental market. In this declaratory judgment action they principally seek a federal court determination that the restriction scheme constitutes a "taking" of their property within the meaning of the United States Constitution.

They do not seek damages—at least at this time in this court.

I find the plaintiff property owners stumble at the threshold of their action. Treated as a facial challenge to the restrictions, their claim is barred by the statute of limitations. Treated as "as-applied" challenges, their claims are either barred by the statute or are not yet ripe. Consequently, I will dismiss this law suit as untimely.

My dismissal rests on broader alternative grounds as well. I decline to entertain this "state-takings" law suit in a federal declaratory judgment context when the plaintiffs have failed to crystallize their claims through adequate and available state mechanisms for determining whether a taking without just compensation has occurred.

I

At issue is the constitutionality of those provisions of a Cambridge ordinance and the regulations promulgated thereunder which govern the ability of Cambridge landlords to remove their property from the rental housing market. Specifically, the plaintiffs challenge the requirement that any owner of a Cambridge apartment subject to rent control must obtain a permit from the Cambridge Rent Control Board prior to taking any action that would effect a removal.[1]

–A–

### The Regulatory Scheme

A system of rent control has been in effect in Cambridge since 1970. *See generally* Clark, *Rent Control in Massachusetts*, 73 Mass.L.Rev. 160 (1988). In 1976, the city enacted a version of the current rent control regulatory scheme pursuant to

---

1. Count One of the Complaint alleges that the "Removal Prohibitions result in a taking of the plaintiffs' property without due process or just compensation in violation of the fifth and fourteenth amendments to the United States Constitution, and Part I, Articles 1 and 10 of the Massachusetts Declaration of Rights." ¶ 23.

Count Two alleges that the "Removal Restrictions on their face, and as applied to the plaintiffs and to their property, result in unequal protection of the laws, in violation of the Fourteenth Amendment of the United States Constitution, and Part I, Articles 1 and 7 of the Massachusetts Declaration of Rights." ¶ 26.

Count Three alleges that the defendant Rent Control Board has failed to make certain studies regarding rental units as required by the local ordinance.

Chapter 36 of the Massachusetts Acts of 1976.

In 1979, Cambridge adopted a municipal ordinance, the "Removal Permit Ordinance," that established a program of restricting removal of housing units from the rental market.[2] The "Declaration of Emergency" in the first section of the Removal Permit Ordinance sets forth the following justification for adoption of the measure:

A serious public emergency continues to exist in the City of Cambridge with respect to the housing of a substantial number of its citizens, as declared by Chapter 36 of the Acts of 1976, for the reasons stated in the Act. The emergency has worsened since 1976 because of the removal of a substantial number of rental housing units from the market, by condominium conversion, demolition, and other causes. As a result, more than 2,000 or over 10 percent of the controlled rental units in the city have been removed from the housing market since 1970, and the vacancy rate has fallen below one percent. In order to carry out the purposes of the Act, and to continue to provide a sufficient supply of decent, affordable rental housing accommodations especially for families of low and moderate income and for elderly people on fixed incomes, it is necessary for the Cambridge City Council, in the exercise of its powers under section 6 of the Home Rule Amendment and under section 5(c) of the Act, to regulate the removal of controlled rental housing units from the market.

The Removal Permit Ordinance applies to housing units offered for rent prior to August 13, 1979. The Ordinance prohibits the owner of such a unit from ceasing to rent it without a removal permit, but entitles the owner to a "fair net operating income" on the use of the property as rental property. Judicial review of a decision to grant or deny a removal permit is provided in the state courts.

Sanctions for violation of the Ordinance can be severe. The Ordinance authorizes the city to take by eminent domain any apartment repeatedly or flagrantly occupied by its owner without a permit or left vacant for more than 120 days. Criminal penalties may be imposed for removing housing units from the rental market without a removal permit.[3]

In 1981, the constitutionality of the rent control laws was directly challenged in Massachusetts state courts. Relying in part upon federal takings case law, the Supreme Judicial Court upheld the ordinances in their entirety. *Flynn v. City of Cambridge*, 383 Mass. 152, 418 N.E.2d 335 (1981).

However, the Cambridge removal restrictions have not as yet generated such a definitive ruling by the Supreme Judicial Court. In 1983, the SJC affirmed, without opinion, the denial of a removal permit to an owner who wanted to demolish his residential building. *Fresh Pond Shopping Center, Inc. v. Rent Control Board of Cambridge*, 388 Mass. 1051, 446 N.E.2d 1060 (1983) (equally divided court). The United States Supreme Court, also without opinion, dismissed the appeal for want of a substantial federal question. *Fresh Pond Shopping Center, Inc. v. Callahan*, 464 U.S. 875, 104 S.Ct. 218, 78 L.Ed.2d 215 (1983). But Justice Rehnquist wrote a dissent from the dismissal in which he observed that he would have noted probable jurisdiction because the case "present[ed] important and difficult questions concerning the application of the Takings Clause." *Id.* at 876, 104 S.Ct. at 218 (Rehnquist, J., dissenting). Relying on *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868

---

2. The removal restrictions were originally contained in Ordinance No. 926 and are now codified, with certain amendments, as Ordinance No. 966 of the City of Cambridge, c. 23 of the Code of the City of Cambridge.

3. *See Commonwealth v. Kapsalis,* 26 Mass. App.Ct. 448, 450, 529 N.E.2d 148, *review den.,* 403 Mass. 1105, 531 N.E.2d 1274 (1988) (affirming criminal conviction and six-month sentence of an apartment building owner who "willfully removed one or more controlled rental units from residential use by modification of them ... without obtaining an unconditional removal permit ... from the rent control board.")

(1982), he concluded that the Ordinance and removal regulations constituted a taking because they "effected a permanent physical invasion of appellant's property." *Fresh Pond,* 464 U.S. at 877, 104 S.Ct. at 219.

The SJC revisited the Cambridge Ordinance in 1986 in *Polednak v. Rent Control Board of Cambridge,* 397 Mass. 854, 494 N.E.2d 1025 (1986), when it held that an owner who purchased the apartment in which she was a tenant at the time of the conversion of the unit to a condominium did not need to apply for a removal permit and that a regulation which required her to do so unless she had been the tenant prior to August 10, 1979, could not be applied to her. However, the SJC declined to assess the effect of *Teleprompter* on its holding in *Flynn. Id.* at 855, 862 n. 9, 494 N.E.2d 1025.

–B–

*The Plaintiffs*

There are two plaintiff entities—the Southview plaintiffs and the Blevins plaintiffs—both of which own Cambridge apartment buildings covered by the Removal Permit Ordinance.

1. *The Southview Plaintiffs* consist of a housing cooperative, which owns a residential building containing approximately 100 units, and its individual shareholders. In 1979, before the adoption of the Removal Ordinance, the owners sought to convert their building into condominiums. After the master deed was recorded, but before any of the units were sold, the Removal Permit Ordinance was adopted and became effective on August 13, 1979, thereby preventing the sale of any of the units in the building without a removal permit. The Southview Plaintiffs sought permits in January, 1980, but the Rent Control Board denied the applications in April, 1980. The Southview Plaintiffs did not seek judicial review of this determination.

The original Removal Permit Ordinance did not expressly subject cooperative housing to the removal requirement, and in 1980 the Southview owners proceeded to convert the building into a cooperative. The shareholders in the new corporation became the "owners" of the units associated with their respective shares. After these transactions, the Rent Control Board adopted an "interpretive" regulation restricting the availability of any exemption for cooperatives to those units that were owner-occupied at the time of the adoption of the Removal Permit Ordinance in 1979.

Southview brought a state court action seeking a declaration that the interpretive application of the Removal Permit Ordinance to cooperatives was inconsistent with the Ordinance. The state courts found for the Rent Control Board. *Southview Co-operative Housing Corp. v. Rent Control Board of Cambridge,* 16 Mass.App. 1102 (1983). Southview also applied for removal permits, which were denied in 1980. No independent judicial review of that permit denial determination was pursued.

2. *The Blevins Plaintiffs* are two trusts of which Charles Blevins is trustee. The trusts own four residential buildings in Cambridge, with a total of 172 rental units. In 1981, after the adoption of the Removal Permit Ordinance, Blevins formed two condominium associations, intending to sell the units. At about the same time, one of the tenants in one of the buildings applied for a removal permit in order to purchase and occupy a vacant unit in the same building. Nine months later, that individual permit was granted, but by then the tenant had changed his mind, so the permit was not used. Blevins, allegedly concluding that applying for permits was futile, has never sought removal permits.

II

The federal jurisdictional grounds for this action is the Civil Rights Act of 1871, 42 U.S.C. § 1983. The statute of limitations for a claim under § 1983 is the general personal injury statute of limitations of the state whose action is under review. *Owens v. Okure,* 488 U.S. 235, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989); *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). The relevant Massachusetts statute, Mass.Gen.L. ch. 260, § 2A, provides a period of three years from

the date of the injury complained of in which to initiate such a suit.[4] Because the plaintiffs have not brought suit within that period, this action must be dismissed.

–A–

Courts confronting § 1983 challenges to regulatory schemes affecting real property interests have consistently deemed the cause of action to have accrued when the plaintiff's property interest was definitively burdened by the scheme. *See, e.g., Peter Henderson Oil Co. v. Port Arthur,* 806 F.2d 1273, 1275 (5th Cir.1987); *McMillan v. Goleta Water Dist.,* 792 F.2d 1453, 1456–57 (9th Cir.1986), *cert. denied,* 480 U.S. 906, 107 S.Ct. 1348, 94 L.Ed.2d 519 (1987); *Altair Corporation v. Pesquera de Busquets,* 769 F.2d 30, 32 (1st Cir.1985).

The Supreme Court has emphasized the distinction "between a claim that the mere enactment of a statute constitutes a taking and a claim that the particular impact of government action on a specific piece of property requires the payment of just compensation." *Keystone Bituminous Coal Assn. v. DeBenedictis,* 480 U.S. 470, 494, 107 S.Ct. 1232, 1247, 94 L.Ed.2d 472 (1987). Accordingly, application of the statute of limitations to plaintiffs' claims will be analyzed separately from the distinctive (1) facial and (2) as-applied perspectives.

■ (1) *Facial Perspective*—Viewed as a facial claim, plaintiffs' contention is that their property was definitively burdened upon the mere enactment of the Removal Permit Ordinance, an event which took place in 1979. *Cf. Lorance v. AT & T Technologies,* 490 U.S. 900, 109 S.Ct. 2261, 2268, 104 L.Ed.2d 961 (1989) ("Because the claimed invalidity of the seniority system is wholly dependent on the alleged illegality of signing the underlying agreement, it is the date of that signing which governs the limitations period.") The three-year limitations period, therefore, expired in 1982. Plaintiffs' present challenge to the removal permit scheme on its face—mounted some six years later—is thus barred.

■ (2) *As–Applied Perspective*— Viewed as an as-applied challenge distinctive from the facial challenge discussed above, plaintiffs' claims can arise only when a removal permit has been denied. That is the point at which the particular burden of the Removal Permit Ordinance definitively impacts plaintiffs' property, the point when the plaintiffs are denied a specific opportunity to remove their property from the rental market. For the Southview plaintiffs this occurred in 1980. Thus, the statute of limitations period expired on those claims in 1983. They have made no new permit applications since then and therefore, as discussed in Section II.C. *infra,* any new as-applied challenge to the Removal Permit Ordinance is not yet ripe. The Blevins plaintiffs have never been denied a permit; accordingly, for reasons set

---

**4.** In treating the relevant limitations bar to be the statute of limitations rather than the doctrine of laches, I recognize that the plaintiffs here seek only declaratory judgment, an equitable remedy. That is a strategic pleading choice. But the causes of action underlying the declaration sought are legal ones which would ultimately lead to damages if constitutional violations were declared. "[C]ivil rights claims are assertable as legal rights, enforceable in actions at law as well as in equity; hence equity's jurisdiction is concurrent, not exclusive. And since the plaintiff could have sought relief at law, the statute of limitations period is observed in equity." *Clulow v. State of Oklahoma,* 700 F.2d 1291, 1302 (10th Cir.1983), *overruled on other grounds, Garcia v. Williams,* 731 F.2d 640 (10th Cir.1984). *See also Nemkov v. O'Hare,* 592 F.2d 351, 355 (7th Cir.1979); *Saffron v. Department of the Navy,* 561 F.2d 938, 942–44 (D.C.Cir.1977), *cert. denied* 434 U.S. 1033, 98 S.Ct. 765, 54 L.Ed.2d 780 (1978); *Williams v. Walsh,* 558 F.2d 667, 670–73 (2d Cir.1977); *Madison v. Wood,* 410 F.2d 564, 567–68 (6th Cir.1969). Even were I to find laches rather than the statute of limitations to be the relevant limitations bar in this proceeding, I would still be guided by the statute of limitations period. The principle was stated by Justice Black in *Cope v. Anderson,* 331 U.S. 461, 464, 67 S.Ct. 1340, 1341, 91 L.Ed. 1602 (1947) where he noted that "equity will withhold its relief ... where the applicable statute of limitations would bar the concurrent legal remedy." At a minimum, if laches were the relevant standard, the plaintiffs would bear the burden of overturning the presumption that laches applies by showing that their delay in bringing suit was not unreasonable and that there had been no prejudice to the defendant. *Cf. McKinney v. Waterman Steamship Co.,* 739 F.Supp. 678, 680–81 (D.Mass.1990) (applying laches in seaman's tort context). Plaintiffs do not even purport to undertake this burden.

forth in Section II.C. *infra,* they also are unable to present an as-applied challenge ripe for judicial determination.

–B–

The plaintiffs seek to avoid the statute of limitations bar by arguing (1) the bar is inapplicable in the declaratory judgment context, (2) the bar is tolled because the burden of rent control is a continuing one and (3) the bar is inappropriate in the context of constitutional challenges to ongoing regulatory schemes.

(1)

■ The plaintiffs contend that their declaratory judgment action is essentially defensive and thus falls outside the scope of the statute of limitations. The statute of limitations, however, may not be sidestepped simply by labelling an action one for declaratory or injunctive relief, rather than one for damages. *Town of Orangetown v. Gorsuch,* 718 F.2d 29, 42 (2d Cir.1983), *cert. denied,* 465 U.S. 1099, 104 S.Ct. 1592, 80 L.Ed.2d 124 (1984). Instead, courts look to the "substance of a claim" and "[i]f this examination reveals that a claim for declaratory relief could have been resolved through another form of action which has a specific limitations period, the specific period of time will govern." *Id.*

The plaintiffs argue that there should be no limitations bar when a potential defendant in an enforcement action seeks to bring a declaratory judgment suit. This contention was disposed of by the Temporary Emergency Court of Appeals in *Mobil Oil Corp. v. Dept. of Energy,* 728 F.2d 1477, 1487 (Temp.Emer.Ct.App.1983), *cert. denied,* 467 U.S. 1255, 104 S.Ct. 3545, 82 L.Ed.2d 849 (1984). The *Mobil Oil* court found that while there was "little authority" on the question, the authority available

suggested that a declaratory judgment plaintiff could not, for purposes of statutes of limitations, "be assimilated to the status of a defendant." *Id.* at 1487–88.[5]

The proposition for which *Gorsuch* and *Mobil Oil* stand—that the statute of limitations is applicable to parties who initiate affirmative litigation designed to challenge regulatory provisions which have otherwise survived the limitations period—was underscored evocatively by the Second Circuit in *118 East 60th Owners, Inc. v. Bonner Properties, Inc.,* 677 F.2d 200 (2d Cir.1982). In *Bonner Properties,* the court labeled a plaintiff initiating affirmative litigation to challenge a settled relation between the parties as the "aggressor" because the action attempted to disturb an equilibrium established after a ten-year period of inactivity. *Id.* at 204.[6]

Of course, a party cast as a defendant in litigation may be relieved from the statute of limitations. For instance, the statute of limitations does not bar a defendant in an enforcement action, whether criminal or not, from disputing the constitutionality of the statute he is charged with violating. *Cf. Stone v. White,* 301 U.S. 532, 539, 57 S.Ct. 851, 8, 81 L.Ed. 1265 (1937). *Cf.* Monaghan, *Overbreadth,* 1981 Sup.Ct.Rev. 1, 8 n. 30 ("A 'defendant in a coercive proceeding ... always has standing to challenge the validity of the statute in the terms in which it is applied to him.' [BATOR, MISHKIN, SHAPIRO & WECHSLER] HART & WECHSLER's [THE FEDERAL COURTS AND THE FEDERAL SYSTEM] 1981 Supplement at 88. But the position of a prospective defendant bringing an action for declaratory relief need not be assimilated to that of an actual defendant.") Thus, as Professor Monaghan suggests, a plaintiff bringing a de-

---

**5.** *Mobil Oil,* while arising in the laches setting, treated the analysis on this point for laches purposes to be the same as the analysis for statute of limitations purposes. *See also* note 4 *supra.*

**6.** Plaintiffs cite an older Second Circuit case, *Luckenbach S.S. Co. v. United States,* 312 F.2d 545 (2d Cir.1963) for the broad proposition that any claim which could provide a defense may be asserted without regard to a statute of limita-

tions bar. *Luckenbach,* however, involved a passive assertion of nonliability for payments allegedly due and did not arise in the context of an affirmative attack upon a regulatory scheme. To the degree *Luckenbach* has survived subsequent case law development in *Bonner* and *Gorsuch,* it stands for an exceptionally narrow exception to the applicability of the statute of limitations bar to declaratory judgment actions.

48

claratory judgment action under § 1983 is not thereby cast—or "assimilated"—in a "defensive" posture. Otherwise, any plaintiff might style his § 1983 action for damages as a declaratory judgment action and avoid the statute of limitations altogether. If such a declaratory judgment plaintiff could freely characterize himself as being in a "defensive" posture, the constitutionality of any regulatory provision—no matter how long standing—could be subject to judicial review at any time without regard to the values of repose the statute of limitations protects.

(2)

■ The plaintiffs argue that because the permit removal scheme is a continuing regulation the statute of limitations period has never truly accrued. The argument is mounted by erroneous reliance upon a case involving land taken by the rising waters of a dam. *United States v. Dickinson*, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947). In *Dickinson*, the Court held that the running of the statute did not necessarily commence when the dam first began to impound the water. Quoting selectively from the opinion, the plaintiffs look to the following language, underscored and elided as the plaintiffs have presented it in their brief:

> *The source of the entire claim—the overflow due to rises in the level of the river—is not a single event; it is continuous ....* When dealing with a problem which arises under such diverse circumstances procedural rigidities should be avoided.

*Id.* at 749, 67 S.Ct. at 1385 (as presented in "Plaintiffs' Memorandum in Opposition to the Defendant's Motion to Dismiss" at 37).

The answer to plaintiffs' argument is contained in the sentence represented only by the ellipsis in their quotation from *Dickinson*. In that sentence, the Court observed: "And as there is nothing in reason, so there is nothing in legal doctrine, to preclude the law from meeting such a process by postponing suit until the situation becomes stabilized." *Id.* This is simply another way of stating—in the context of water damage—that the period for bring-

ing an action *does* accrue when "the situation becomes stabilized," in other words when the plaintiff's property is definitively burdened by the governmental action.

The First Circuit alluded to the critical distinction in *Altair Corporation.* There the court rejected an

> argument concerning the continuing violation exception to the general rule [regarding the limitations bar because it] confuses a continuing act with a single act that has continuing consequences. *Ward v. Caulk*, 650 F.2d 1144, 1147 (9th Cir.1981) ("A continuing violation is occasioned by continuing unlawful acts, not by continued ill effects from an original violation.") In a § 1983 case concerning the unlawful taking of property, the statute of limitations begins to run on the date of the wrongful appropriation.

769 F.2d at 32.

(3)

■ The plaintiffs place their opposition to the statute of limitations bar on the highest policy level by arguing that constitutional challenges are not subject to limitations periods. Apparently, plaintiffs contend that any legislative enactment should be subject at all times and by any procedure to constitutional challenge. Apart from the inherent and continuing interest that constitutional disputes have for lawyers, however, there is no good reason to depart in constitutional cases from the principles of repose protected by statutes of limitation.

The principles of repose are particularly salient in connection with economic regulatory schemes from which a complex web of reliance interests is woven over time. Various parties make decisions based on expectations that the regulatory scheme will not be disrupted except by the customary political and administrative process. Thus, belated judicial intervention may significantly prejudice not only the defendant public instrumentality but also the various affected parties who have relied on the regulatory scheme.

Plaintiffs suggest that applying limitations periods to defensive declaratory judg-

ment actions could effectively immunize constitutionally repugnant state action from review. That characterization overstates the proposition. A state enactment would simply be protected from belated challenge by affirmative litigation. The enactment would continue to be subject to reevaluation if any party to an enforcement proceeding raises an affirmative defense of unconstitutionality. "A defendant in a coercive action always has standing to challenge the rule actually applied to him." Monaghan, *Harmless Error and the Valid Rule Requirement*, 1989 Sup.Ct.Rev. 195, 195.

Thus, application of the statute of limitations bar to constitutional questions represents a carefully calibrated balancing of the interest in repose and of the requirement that no person be subject to "sanctions unless they are imposed in accordance with a constitutionally valid rule ..." *Id.*

When a new enactment is initially adopted, a party claiming to be burdened is permitted a reasonable time to challenge its facial constitutionality; the statute of limitations establishes that reasonable time.

Even after the statute of limitations has run, a party may still test the constitutionality of the enactment as applied to his own circumstances if the enactment provides a mechanism, by permit or otherwise, for that party to demonstrate how the enactment applies to him. Thus, as developed more fully in Section II.C. *infra,* a party who seeks and is denied a permit can recommence the running of the statute of limitations by mounting an "as-applied" challenge.

Finally, the affected party may place himself in the posture of a defendant in an enforcement action by noncompliance with the ordinance at any time. His noncompliance and the consequent enforcement action will provide a vehicle for him to challenge the constitutionality of the provision.

In short, the constitutionality of an ordinance is always open to challenge, but the procedures for doing so—in recognition of the values of repose—place increasing burdens over time on the party who seeks to challenge the equilibrium the regulation has created.

–C–

In order to mount an as-applied challenge to the Removal Permit Ordinance, the plaintiffs must show that the Ordinance applies specifically to them and harms them individually. As discussed above in Part II.A., *supra,* the statute of limitations may begin to run on an as-applied challenge once a plaintiff is denied a removal permit. Somewhat differently stated, an as-applied challenge cannot be ripe until the plaintiff is denied a removal permit. These parallel concepts of accrual and prematurity govern the timeliness of an "as-applied" challenge.

> In suits for wrongful deprivation of property under 42 U.S.C. § 1983, the same considerations that render a claim premature prevent accrual of a claim for limitations purposes, and the claim does not accrue until the relevant governmental authorities have made a final decision on the fate of the property.

*Norco Construction, Inc. v. King County,* 801 F.2d 1143, 1146 (9th Cir.1986) (Kennedy, J.).

The permit application requirement is not a mere formality; it is the means for framing the dispute with finality.

■ In order to raise an "as-applied" challenge, especially in the takings context, a party must take the steps necessary to demonstrate how the ordinance is applied to him. In its most recent treatment of a takings challenge to rent control, the Court admonished that

> [g]iven the "essentially ad hoc, factual inquir[y]" involved in the takings analysis, *Kaiser Aetna v. United States,* 444 U.S. 164, 175 [100 S.Ct. 383, 390, 62 L.Ed.2d 332] (1979), we have found it particularly important in takings cases to adhere to our admonition that "the constitutionality of statutes ought not be decided except in an actual factual setting that makes such a determination necessary." *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U.S. 264, 294–95 [101 S.Ct. 2352, 2369–70, 69 L.Ed.2d 1] (1981). In *Virginia*

*Surface Mining*, for example, we found that a challenge to the Surface Mining Control and Reclamation Act of 1977 ... was "premature", 452 U.S. at 296 n. 37 [101 S.Ct. at 2370 n. 37] and "not ripe for judicial resolution," *id.* at 297 [101 S.Ct. at 2371], because the property owners in that case had not identified any property that had allegedly been taken by the Act, nor had they sought administrative relief from the Act's restrictions on surface mining.

*Pennell v. City of San Jose*, 485 U.S. 1, 10, 108 S.Ct. 849, 856, 99 L.Ed.2d 1 (1988).

Establishing ripeness for a judicial review in the context of a regulatory regime alleged to involve a taking turns on the availability of a permit to obtain desired relief. Again the Supreme Court has spoken emphatically.

A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself "take" the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the permit is denied, there may be other viable uses available to the owner. Only when a permit is denied and the effect of the denial is to prevent "economically viable" use of the land in question can it be said that a taking has occurred.

*United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127, 106 S.Ct. 455, 459, 88 L.Ed.2d 419 (1985).

As the Supreme Court later observed, [o]ur cases uniformly reflect an insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it.

*MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 351, 106 S.Ct. 2561, 2567, 91 L.Ed.2d 285 (1986).

The First Circuit has expressed this concern with the ripeness of a taking claim by holding that

so long as the regulation does not finally take the plaintiff's property, and provides a reasonable means for seeking amendment of the initial action, state administrative action which temporarily limits the use or value of property is not yet ripe for a takings claim.

*Tenoco Oil Co. v. Dept. of Consumer Affairs*, 876 F.2d 1013, 1026–27 (1st Cir.1989).

■ In the context of the Cambridge Removal Permit Ordinance, this ripeness requirement necessitates applying for a permit. The permit process would either relieve the plaintiffs of the burden of complying with the Ordinance or demonstrate clearly the way in which the Ordinance does in fact burden them. Neither plaintiff entity has applied for a permit at any time within the statutory limitations period. Consequently, neither presents an as-applied challenge ripe for judicial resolution.

–D–

Plaintiffs' case is not properly timed to permit judicial resolution. To the degree plaintiffs seek review of the mere enactment of the Removal Permit Ordinance or the failure to issue permits sought more than three years ago, the statute of limitations bars their action and they are too late. To the degree plaintiffs seek to predicate review on the prospect that future applications for permits will be unsuccessful, the issues are not ripe and they are too early. In either event, plaintiffs' claims must be dismissed because they are untimely.

III

■ Apart from the timeliness grounds discussed in Section II, *supra*, there is an alternative basis for dismissing this law suit: the questionable propriety of the federal declaratory judgment device as a means to obtain a partial resolution of the question whether the "takings" clause of the fifth amendment to the United States Constitution is implicated by the Cambridge Removal Permit Ordinance. I find that a federal declaratory judgment action is not an appropriate procedure in this case to resolve a "takings" clause law suit. My conclusion depends in equal part upon the special character of "takings" litigation

and the special qualities of the declaratory judgment device.

Given the highly deferential analysis applied to due process [7] and equal protection [8] challenges of economic enactments such as the Cambridge rent control scheme, the "takings" clause has increasingly been seized upon as a convenient handle for obtaining judicial scrutiny of such enactments.

Takings litigation, however, is an oblique means of challenging economic enactments. This is because, assuming a proper public purpose, the takings clause is not a basis for directly overturning a form of regulation. Rather, it is a mechanism for attaching a price tag to certain action the government seeks to undertake. The fifth amendment takings clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The takings clause thus "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." *Preseault v. Interstate Commerce Commission*, —— U.S. ——, 110 S.Ct. 914, 921, 108 L.Ed.2d 1 (1990) (quoting *First English Evangelical*

*Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 314, 107 S.Ct. 2378, 2385, 96 L.Ed.2d 250 (1987)).

A takings clause claim has two essential components: the taking itself and the lack of just compensation. Proper adjudication of such claims requires special considerations designed to insure the constitutional questions are fully developed before they are resolved. A necessary implication of those procedures is that a proposed use of declaratory judgment to address only one of the elements must be scrutinized carefully to avoid the dangers of inadequate development of the constitutional issues. In this case, declaratory judgment as to only the takings element would be inappropriate; and, consequently, even if the plaintiffs' claims were timely, I would decline to exercise my discretion to hear plaintiffs' law suit.

–A–

■ In *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), the Supreme Court held that "if a State provides an

---

**7.** The plaintiffs' substantive due process claim as pleaded cannot withstand review on the merits. As the First Circuit recently observed, quoting from a case considering a previous exercise in land use regulation by the City of Cambridge:

> The test to be applied in considering substantive due process challenges to a land use ordinance was established early on: "a court should not set aside the determination of public officers in [zoning] matter[s] unless it is clear that their action 'has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense.'" *Nectow v. Cambridge*, 277 U.S. 183, 187–88 [48 S.Ct. 447, 448, 72 L.Ed. 842] (1928) quoting *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 [47 S.Ct. 114, 121, 71 L.Ed. 303] (1926).

*Smithfield Citizens for Fair Zoning v. Town of Smithfield*, 907 F.2d 239, 243–44 (1st Cir.1990). Thus, in adjudicating such a claim "a court asks only whether a *conceivable* rational relationship exists between the ... ordinance and legitimate governmental ends." *Id.* at 244 (emphasis in original); *see also Tenoco Oil Co. v. Department of Consumer Affairs*, 876 F.2d 1013, 1021–22 & n. 15 (1st Cir.1989). The relationship between limitations on removal of housing from the

rental market and the goal of providing adequate rental housing is apparent from the emergency declaration to and structure of the Removal Permit Ordinance. Such a relationship requires no further development to survive plaintiffs' substantive due process challenge.

**8.** The plaintiffs' equal protection claim also cannot withstand review on the merits. As the Supreme Court recently observed in rejecting an equal protection challenge to aspects of a rent control scheme,

> [the municipality] need only show that the classification scheme embodied in the Ordinance is "rationally related to a legitimate state interest ... we will not overturn [a statute that does not burden a suspect class or a fundamental interest] unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.

*Pennell v. City of San Jose*, 485 U.S. 1, 14, 108 S.Ct. 849, 856, 99 L.Ed.2d 1 (1988) (citations omitted). However misguided some may view rent control generally and the removal permit process specifically, it cannot be said that the enactment of such schemes is irrational.

adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *Id.* at 195, 105 S.Ct. at 3121.

As the *Williamson* Court observed, the fifth amendment does not require that compensation be paid in advance of or even at the same time as the taking. *Id.* at 194, 105 S.Ct. at 3120. Assuming state procedures are adequate, "no constitutional violation occurs until just compensation has been denied." *Id.* at 194 n. 13, 105 S.Ct. at 3120 n. 13.

In *Ochoa Realty Corp. v. Faria*, 815 F.2d 812 (1st Cir.1987), the First Circuit relied on *Williamson* and *Culebras Enterprises Corp. v. Rios*, 813 F.2d 506 (1st Cir.1987) in holding that "exhaustion of state law remedies—whatever form they may take—is a precondition to the maintenance of a federal damages action under the Takings Clause." *Ochoa Realty Corp.*, 815 F.2d at 817.[9] *Ochoa* and *Culebras* agreed that Puerto Rico case law—despite the absence of an explicit statute—indicated Puerto Rican courts would entertain an inverse condemnation action for damages. *Id.*

The Massachusetts inverse condemnation statute expressly provides for compensation "[w]hen the real estate of any person has been taken." M.G.L. c. 79, § 10. "Mass.Gen.L. ch. 79, § 10 provides a specific statutory remedy for governmental actions which amount to a taking without formal condemnation proceedings." *Ackerley Communications of Massachusetts, Inc. v. Somerville*, 692 F.Supp. 1, 28 (D.Mass.1988), *rev'd on other grounds*, 878 F.2d 513 (1st Cir.1989). *See Fram v. Boston*, 363 Mass. 68, 72, 292 N.E.2d 356 (1973) ("If there had been a 'taking' of the plaintiff's property other than pursuant to

a formal vote of the authority, the plaintiff would still have been entitled to petition for the assessment of damages.")

Plaintiffs suggest that a Massachusetts inverse condemnation proceeding is unavailable because an exception in Mass. Gen.L. ch. 79 § 10 denies access to the § 10 proceeding if the taking was "effected by or in accordance with a formal vote or order of the board of directors of a body politic." *Id.* Plaintiffs, however, take these words out of context. The "formal vote or order" referred to in § 10 are the predicates for formal eminent domain proceedings in which the condemnation is direct not inverse. Here the alleged takings were inverse rather than direct, so the Massachusetts' inverse condemnation procedure under § 10 provides the plaintiffs with an adequate means of obtaining just compensation for any alleged taking.

Plaintiffs correctly point out that *Williamson*, *Ochoa*, and *Culebras* may be distinguishable because they were all actions for damages. On that basis, plaintiffs seek to limit the effect of *Williamson* to state takings litigation for money damages. The *Williamson* court, however, found that "no constitutional violation" could be established until the property owner utilized the inverse condemnation proceeding. 473 U.S. at 194 n. 13, 105 S.Ct. at 3120 n. 13. Logically, "no constitutional violation" means no violation for declaratory relief purposes as well as for any damages purposes. This proposition recognizes that while takings litigation can, for analytical purposes, be split into two basic elements—the taking itself and the compensation for it—the two elements are inextricably intertwined. Determining whether a regulatory taking affects part of the complex bundle of rights which constitute a real property interest requires some inquiry into the compensable value of those rights. This inquiry is effectively the equivalent of the damages in-

---

**9.** The reference to "exhaustion of state law remedies" in *Ochoa* may be somewhat misleading because it presents the potential for confusing *Williamson*'s requirement of finality as a prerequisite to bringing a state takings action in federal court with the holding of *Patsy v. Florida Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) that exhaustion of reme-

dies is not a necessary prerequisite to bringing a § 1983 action. The concepts of finality and exhaustion are clearly distinguished in a helpful discussion in *Tenoco Oil Co. v. Dept. of Consumer Affairs*, 876 F.2d 1013, 1024 (1st Cir.1989). It appears that the *Ochoa* reference to "exhaustion" was intended to refer to the concept of finality in the takings context.

quiry which *Williamson* and *Ochoa* require to be deferred by the federal court until state proceedings are finalized.[10]

While the *Williamson* line of cases may not on its own directly bar plaintiffs' takings claims as unripe, these cases clearly demonstrate the logic of a rule requiring federal courts to defer resolving any state takings issues when a state inverse condemnation is available, but has not been pursued. Resort to the state proceeding would appear to be a necessary precondition to establishing the finality required before federal courts may consider state takings no matter how the cause of action is styled.

–B–

Irrespective of whether the *Williamson* line of cases is to be applied with full force to bar state takings claims seeking declaratory relief, I would decline jurisdiction in this case. Federal declaratory judgment should not become a ready procedural mechanism for the federal courts to reevaluate state economic legislation from a takings perspective until state procedures have run their course. Nothing in this case commends itself to any premature federal intervention.

The power to grant a declaratory judgment clearly rests in the discretion of the district court. *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 126, 88 S.Ct. 733, 746, 19 L.Ed.2d 936 (1968). *See generally* Wright, Miller & Kane, *Federal Practice and Procedure*, § 2759 at 644 (1983). The trial court's discretion, of course, is not absolute, and the

court may not refuse to entertain a declaratory action "as a matter of whim or personal disinclination." *Public Affairs Associates, Inc. v. Rickover*, 369 U.S. 111, 112, 82 S.Ct. 580, 582, 7 L.Ed.2d 604 (1962). Here, however, the availability of the Massachusetts inverse condemnation proceeding provides a principled basis for declining to exercise the discretion to entertain a declaratory judgment proceeding.

Of course, the existence of "another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate." Fed.R.Civ.P. 57. But in the exercise of its discretion, the court may deny declaratory relief if the state courts can more effectively resolve the claim. *See Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 495, 62 S.Ct. 1173, 1175, 86 L.Ed. 1620 (1942) (federal declaratory judgment court has duty to ascertain whether questions in controversy can better be settled in state court proceeding).

Professor Moore observes that:

[t]he fact that in the future another action might be instituted, which would involve the same issues, is not alone sufficient reasons to ground a denial of declaratory relief. Where, however, the other remedy would be a more effective or appropriate remedy the court may properly decline to assume jurisdiction in the declaratory action.

6A *Moore's Federal Practice* ¶ 57.08[3] at 57–44 (2d ed. 1989). Professor Moore also notes "some authority that where a special statutory remedy has been provided, declaratory action should be refused." *Id.*

---

**10.** The First Circuit has suggested that federal equitable relief might be available in state takings cases even if a federal damage action must await resolution of the state condemnation action. *See generally Culebras Enterprises Corp. v. Rivera Rios*, 813 F.2d 506, 509–12 (1st Cir.1987) and cases cited. But those cases were concerned with the then-unresolved question whether a temporary taking was compensable. If such a taking were not compensable—that is if there were no money damages ultimately available for the period until a definitive judicial determination that a taking had occurred—a party challenging the taking would demonstrate irreparable harm sufficient to justify injunctive intervention. But, as the First Circuit recently noted in *Tenoco:* "[t]he Su-

preme Court subsequently ... held that damages are retrospectively available for the period of the 'temporary' takings, *i.e.* regulatory takings ultimately invalidated as unconstitutional by the courts. *See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304 [107 S.Ct. 2378, 96 L.Ed.2d 250] (1987)." 876 F.2d at 1026 n. 20. Thus, the considerations which may have impelled equitable intervention before *First English Evangelical Lutheran Church* in order promptly to establish that a compensable taking had occurred are no longer applicable. It is now established that just compensation is available for the duration of a taking no matter how long a period is consumed before the courts definitively determine that the taking has occurred.

The Massachusetts courts can fully—through an inverse condemnation proceeding—review any claim that the Removal Permit Ordinance is unconstitutional or that the level of compensation is inadequate.

Declining to exercise federal declaratory judgment jurisdiction over state takings disputes until the conclusion of state procedures also supports the "public interest" in insuring that the federal courts "avoid needless determination of constitutional questions which may lead to a needless obstruction of the domestic policy of the states." *Alabama State Federation of Labor v. McAdory*, 325 U.S. 450, 471, 65 S.Ct. 1384, 1394, 89 L.Ed. 1725 (1945). That "public interest" is "of controlling significance" in determining whether to exercise the "discretionary power to grant or withhold the declaratory remedy." *Id.*

"A declaratory judgment," Justice Frankfurter observed:

like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised in the public interest. It is always the duty of a court of equity to strike a proper balance between the needs of the plaintiff and the consequences of giving the desired relief. Especially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative.

*Eccles v. Peoples Bank of Lakewood Village*, 333 U.S. 426, 431, 68 S.Ct. 641, 644, 92 L.Ed. 784 (1948) (citations omitted).

A constitutionally based concern that the federal courts not provide advisory opinions in the state takings context must restrain the exercise of declaratory judgment jurisdiction here. As Chief Justice Stone observed in *Alabama Labor Federation v. McAdory*, the federal courts are "without power to give advisory opinions ... It has long been the [federal courts] considered practice not to decide abstract, hypothetical or contingent questions ..." 325 U.S. at 461, 65 S.Ct. at 1389.

To be sure, the Supreme Court has found itself addressing the problems of state takings in somewhat abstract, hypothetical and contingent settings. The Court noted one of the problems thereby created in its most recent case involving a state rent control scheme. *Pennell v. City of San Jose*, 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988). Observing the difficulties created in evaluating the standing of the parties, the Court commented:

[W]e recognize that the record in this case leaves much to be desired in terms of specificity for purposes of determining the standing of appellants to challenge this Ordinance. Undoubtedly this is at least in part a reflection of the fact that the case originated in a state court where Art. III's proscription against advisory opinions may not apply.

*Id.* at 8, 108 S.Ct. at 855. It bears noting that the adjudication of intensely fact bound questions on limited records has not necessarily served the federal courts well in developing the law of just compensation.[11] The practice should not be encouraged.

Whether or not state courts are willing to provide advisory opinions on limited records, the recognition that the record in federal declaratory judgment action will not fully develop both elements of the state taking question should make the federal courts all the more reticent about being

---

11. The desire to obtain a Supreme Court decision on interesting constitutional questions in the takings context and the Court's occasional willingness to provide one—even in the absence of an adequately developed record—may account for the view of certain commentators "that it is difficult to imagine a body of case law in greater doctrinal and conceptual disarray [than current takings clause doctrine]." Peterson, *The Takings Clause: In Search of Underlying Principles: Part I—A Critique of Current Takings Clause Doctrine*, 77 Calif.L.Rev. 1299, 1304 (1989); *see also* Fischel, *Introduction: Utilitarian Balancing and Formalism in Takings* to *Symposium: The Jurisprudence of Takings*, 88 Colum.L.Rev. 1581, 1589 (1988) ("The symposium articles offer some insight into why the Supreme Court has so far failed to come up with a more coherent approach to the regulatory taking issue."); Epstein, *Takings: Descent and Resurrection*, 1987 Sup.Ct.Rev. 1, 44 ("If takings litigation had been unsettled before the recent Term, it is surely unsettled now.").

drawn into giving partial answers to the complex constitutional questions presented by takings litigation. Here I am asked only to decide whether there is a taking without addressing the rest of the constitutional puzzle: if there is a taking, is just compensation being provided? The first element is ultimately meaningful in a constitutional sense only if coupled with the second element.

The strategic [12]—and theoretical [13]—implications of declaratory judgment takings litigation as a mechanism for judicial review of economic enactments are subtle, potentially powerful and far ranging. The current constitutional doctrines in the area of takings and just compensation are seen by the commentators as being in disarray. *See* note 11, *supra*. It is an area in which it is important to tread carefully with a full understanding of the precise way in which the state program affects the subject property.[14] This is especially true when issues of judicial federalism are implicated. Invitations such as the one plaintiffs offer to the federal courts to issue contingent constitutional advisory opinions through declaratory judgments regarding pieces of the problem should be resisted. The consequences of asserting jurisdiction through declaratory judgment actions are every bit as inconsistent with the proper role of the

---

**12.** A preemptive federal declaratory judgment action no doubt commends itself to plaintiffs because their ultimate goal, the dismantling of Cambridge's rent control scheme, can be achieved indirectly. If the federal court can be induced to find the Removal Ordinance Permit constitutes a "taking," the City "may elect to abandon its intrusion or discontinue regulations." *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 2387, 96 L.Ed.2d 250 (1987). Courts may be perceived to be more willing to make such a declaration if they are not bound to consider at the same time the economic impact of the holding on the municipality. These considerations appear to be at the core of the preference the California Supreme Court expressed for equitable relief over an inverse condemnation remedy when confronting challenges to land use regulation.

> In combination, the need for preserving a degree of freedom in the land-use planning function, and the inhibiting financial force which inheres in the inverse condemnation remedy, persuade us that on balance mandamus or declaratory relief rather than inverse condemnation is the appropriate relief under the circumstances.

*Agins v. Tiburon,* 24 Cal.3d 266, 276–77, 157 Cal.Rptr. 372, 378, 598 P.2d 25, 31 (1979), *aff'd on other grounds,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). Whether and, if so, to what degree the California preference for declaratory judgment procedures in evaluating takings challenges to land use regulations will survive *First English Evangelical Lutheran Church* is unclear. *See generally, First English Evangelical Lutheran Church v. County of Los Angeles,* 107 S.Ct. at 2397–98 (Stevens, J., dissenting). Suffice to note for present purposes that the use of the declaratory judgment procedure, while having certain strategic value to private plaintiffs and even to governmental entities—if they choose to employ it—is potentially subject to complex procedural questions in the takings area quite apart from the complexities introduced by considerations of judicial federalism. In Massachusetts, those complexities are further magnified by the special limitations placed on declaratory judgment procedures in rent control litigation. *Cf.* Massachusetts Acts of 1970, c. 842, § 10 (limiting use of state declaratory judgment procedures in judicial review of rental control disputes to circumstances in which administrative remedies have been exhausted).

**13.** The use of the preemptive federal declaratory judgment action in takings litigation is consistent with a broader constitutional agenda: the search for an effective and speedy mechanism to provide a broad scale constitutional challenge to modern social and economic legislation. Professor Epstein, one of the chief theoreticians in this constitutional school, is quite candid in assessing the larger implications of his views that land use regulation is a taking. "It will be said that my position invalidates much of twentieth century legislation and so it does." R. Epstein, *Takings* 281 (1985). *But see* R. Bork, *The Tempting of America* 230 (1990) ("Epstein's constitution would repeal much of the New Deal and the modern regulatory welfare state but ... these conclusions are not plausibly related to the original understanding of the takings clause.... Epstein has written a powerful work of political theory ... but has not convincingly located that political theory in the Constitution.").

**14.** *Cf. Tenoco Oil Co. v. Department of Consumer Affairs,* 876 F.2d 1013, 1028 (1st Cir.1989) ("the requirement that the developer seek a variance would work not only insure that the Court did not needlessly make constitutional rulings, but also that the Commission be put to the test when faced with the type of evidence which would build an administrative record and provide information by which a court could evaluate the validity of the zoning ordinance's application.")

federal courts in a federal system as the premature damage actions which the *Williamson* line of cases expressly rejects.

### IV

For the reasons set forth more fully above, the plaintiffs' claims [15] are hereby dismissed.

**15.** The text of this memorandum has dealt solely with the federal civil rights claims asserted by the plaintiffs. Having determined to dismiss those claims I find no basis to continue to exercise pendent jurisdiction over the remaining pendent state claims. *See generally United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Brennan v. Hendrigan,* 888 F.2d 189, 196 (1st Cir.1989).